RECEIVED
IN LAKE CHARLES, LA
MAR 19 2009
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | DOCKET NO. 2:06 CR 20103 - 002 |
| VS. | : | JUDGE MINALDI |
| RODNEY RYDER | : | MAGISTRATE JUDGE KAY |

### MEMORANDUM RULING

Presently before the court are objections by both the Government and the defendant, Rodney Ryder ("Ryder"), to the Presentence Report ("PSR") prepared by the Probation Department.

After receiving objections by the Government, Probation revised the PSR to incorporate the information provided. This does not require a ruling by the court.

Ryder objects to ¶¶ 9, 17, 38 and all other paragraphs of the PSR which assert that Ryder was responsible for harboring more than 100 unlawful aliens. He argues that the Government did not prove beyond a reasonable doubt the actual number of aliens. In the alternative, if the Government did prove that Ryder harbored more than five unlawful aliens, it was only marginally more than five, therefore the enhancement would be for 6-24 aliens, not more than 100. U.S.S.G. 2L1.1(b)(2)(A).

U.S.S.G. §1B1.3. Relevant Conduct (Factors that Determine the Guideline Range) states:

**(a) Chapters Two (Offense Conduct) and Three (Adjustments).** Unless otherwise specified, (i) the base offense level where the guideline specifies more than one base offense level, (ii) specific offense characteristics and (iii) cross references in Chapter Two, and (iv) adjustments in Chapter Three, shall be determined on the basis of the following:

**(1)(A)** all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and

(B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity,

that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

(2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

(3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

(4) any other information specified in the applicable guideline.

(b) **Chapters Four (Criminal History and Criminal Livelihood) and Five (Determining the Sentence).** Factors in Chapters Four and Five that establish the guideline range shall be determined on the basis of the conduct and information specified in the respective guidelines.

USSG, § 1B1.3, 18 U.S.C.A.

It is Probations's position that several confidential informants and anonymous sources had reported from 50 to over 200 illegal aliens housed in a warehouse on Opelousas Street in Lake Charles, Louisiana. Co-defendant Sergio Alire was recorded stating to confidential informants that he housed over 200 illegal aliens on at least one occasion, and on another occasion, he admitted to approximately 180 illegal aliens. These facts were supported by the evidence introduced at trial.

The PSR and the evidence introduced at trial established in excess of 100 illegal aliens. All of the information contained in the PSR was derived from investigative reports from the Department of Homeland Security, Immigration and Customs Enforcement (ICE). In addition to the investigative efforts of local law enforcement officials and agents of federal law enforcement agencies, the reports also include information obtained from interviews with co-conspirators, both indicted and unindicted.

These reports indicate that on April 25, 2006, ICE agents were contacted by the Fort Polk Provost Marshal's Office concerning five (5) aliens, detained for attempting to unlawfully enter a military base. A search of Immigration databases resulted in no identifiable match to the aliens in custody, but later, three of the aliens were determined to be lawfully present in the United States and were released from custody. The remaining two subjects, Mexican nationals Adelimiro Camara-Pineda and Romeo Galvez-Roblero admitted to entering the country illegally. Camara-Pineda and Galvez-Roblero advised they were employed by Dunham Price for the past five and seven months respectively, earning $9.00 per hour and were housed in a company trailer. They were not required to provide any documentation to work for Dunham Price and both aliens believed their employer to be aware they were illegally in the country. They named Sergio Alire as their supervisor.

In April 2006, Border Patrol agents became involved with an investigation by the Lake Charles Police Department of two subjects arrested for Driving Under the Influence and Hit and Run. The two defendants admitted they were illegally present in the United States. They presented employment cards from American Workforce Solutions ("AWS") (also known as International Workforce Solutions) and stated their boss was Sergio Alire. The aliens took police officers to a warehouse located at 5505 Opelousas Street, Lake Charles, Louisiana. The warehouse was lined with bunk

beds, stacked end-to-end and side-by-side, with only enough room to walk between the beds. Over fifty (50) Hispanic males were in the sleeping area, none of whom spoke English. The sleeping area appeared to accommodate approximately one hundred (100) men. Also on the property at the Opelousas Street site were three trailers, used as sleeping quarters similar to the warehouse. It was estimated that between 250 to 300 illegal aliens were living at the facility. Utilities to the building were registered under the name AWS. Officers with the Lake Charles Police Department stated that there had been a large number of traffic accidents and DUI's involving illegal aliens without identification and insurance who reported 5505 Opelousas Street as their address. Sergio Alire was considered to be the company's liaison to the workers.

In an investigation separate from Border Patrol, ICE agents received information from an anonymous source on May 1, 2006, advising that AWS was housing between 150 and 200 Hispanic males in a commercial building, located at 5505 Opelousas Street. The nationality of the males included Mexican, Honduran, El Salvadoran, Puerto Rican, and Dominican. The immigration status of the males included legal permanent residents, illegal aliens, and prior deports. Information provided to ICE agents indicated there were approximately 100 sleeping cots throughout the building and four trailers on the side of the building, also containing sleeping quarters. A security guard was on duty at the commercial building and no dogs or weapons were at the location, according to the anonymous source. Sergio Alire was employed by AWS as a supervisor/overseer/recruiter of the Hispanic males. Alire was reportedly paid $4,000.00 a week to recruit employees for AWS. Alire's business cards showed he was employed by R&R Contractor Services, LLC, P.O. Box 364, 10523 Highway 105, Melville, Louisiana. Alire frequented Hispanic stores and Wal-Mart in order to solicit employees. AWS hired the recruited individuals to work for various companies throughout the Lake

Charles area, including the Dunham Price Group. Alire provided safety rules and regulations for R&R to the employees in Spanish and English, along with his business card. His business card showed R&R Contractor Services was owned by Rodney Ryder. Further investigation revealed that AWS was owned by co-defendants Keith Smith and Wayne Adams. Rodney Ryder was the sole owner of R&R Contracting Services.

As the investigation continued through May 2006, ICE agents learned that, in addition to recruiting the illegal workers, Alire was responsible for overseeing the daily operations of the employed aliens. Surveillance frequently observed Alire at the Opelousas site. Transportation of employees to and from the various work sites was provided by the employer and consisted of several different buses. There were two main shifts for the workers, the first beginning at 5:00 A.M. daily. In addition to the aliens housed on Opelousas Street, one bus traveled from the Sunrise Inn Motel, where approximately 50 to 60 Hispanic males resided, to and from three area petrochemical plants (including Citgo, Conoco-Phillips, and SASOL North America). Another bus would make trips, beginning around 5:00 A.M., to and from Opelousas Street to the Dunham Price Cement Plant, usually transporting between 80 and 100 Hispanic males.

The anonymous source further advised ICE agents that three Hispanic females, Delmi Arita, Olga Moreira, and Marta Madonado, resided at 317 Calcasieu Street, Lake Charles, Louisiana, and the females would prepare and deliver meals to Opelousas Street twice a day. Surveillance confirmed that a vehicle registered to Alire would deliver the meals.

During the course of the investigation, numerous "trash runs" were conducted, revealing numerous documents illustrating pay scales, names of employees, housing situations, shift assignments, status of workers (to include day or night shift, laid off, fired, vacation, went to Mexico

not coming back, etc), a hand-written document stating "nine guys not working at the camp, 117 in the camp, 36 guys live outside the camp," and AWS's client accounts, billing and employees. This document was originally addressed to Keith Smith, but Smith's name was crossed out and Ryder's name was handwritten in.

At trial, six illegal aliens harbored by the defendants testified as to their respective immigration status and how they came to work for the defendants.[1] Two other individuals, Adelimiro Camara-Pineda and Romeo Galvez-Roblero, were arrested and admitted to being illegal and working for Sergio Alire. Law enforcement testimony at trial also established a cross-section of fourteen (14) workers traveling on the bus from the camp to Dunham Price were also found to be in the United States illegally.

Payroll spreadsheets were introduced at trial with hundreds of Hispanic names reflecting the pool of workers at any given time. Although there was testimony that not *everyone* lived at the "camp" on Opelousas Street, the same testimony established most of the immigrant workers had to because they had no other place to go. This was a "camp" equipped to house over one hundred workers at a time, and the testimony was clear from everyone who worked there, including Amy Taylor, Bruce Slinker, Jerry Ramos and Jack Ewing – an overwhelming majority of the residents were illegal.

Trial testimony also revealed that Alire hired mostly illegal workers. Sergio Alire's testimony corroborated the other testimony, that a high percentage of the residents at the camp were illegal

---

[1] Sergio Alire, recruiter; Delmy Aracely Arita-Lara, cooked meals for illegal workers at the warehouse and sheltered by the defendant; Gerardo Ortega Ramos-Pastor ("Jerry Ramos"), security at the warehouse; Luis A. Pinto, illegal worker; Elmer Antonio Caballer-Quintanilla, illegal worker; and Hugo Adalid Pinto-Galdamez, illegal worker.

6

because that is who he hired – undocumented Hispanic people.

Brenda and Tricia Frame, employees of Rodney Ryder, also testified at trial there was little, if any, paperwork on these illegal workers. Some files had nothing, while others had only preliminary information requested of each worker on a form written in Spanish and handed to them as they signed up for work. This information was analyzed by James Malooley, an Immigration and Customs Enforcement (ICE) Intel Specialist. Of all the workers employed by the "Alliance," 169 names had enough information to analyze. Mr. Malooley's conclusion was that 10 appeared to be in the United States lawfully, while 159 appeared to be illegal. This conclusion was based on an analysis and cross-reference of the information provided, with information kept on several private databases and the Central Indexing System. While Mr. Malooley admitted the preferred method and only absolute way to definitely determine status would be by fingerprints or papers, both of which could not be obtained, his testimony also corroborates the other testimony and facts in this case.

Finally, the Government asserts that there are general admissions by all parties, including the defendants themselves, which further establishes what was obvious – this case involved the harboring of over one hundred illegal aliens. Almost all of the men residing at the camp were Hispanic, and very few spoke English. Translators like Jerry Ramos and Sergio Alire were necessary in communicating and maintaining control.

The evidence contained in the PSR and introduced at trial, including relevant conduct, is sufficient to establish that Ryder and his co-defendants harbored over 100 illegal aliens and the 9-level enhancement is warranted. This objection is OVERRULED.

Ryder also objects to ¶13 and all other paragraphs of the PSR which assert that Ryder was responsible for organizing check cashing for the workers. Ryder believes that the PSR meant to

indicate that Wade Townley was responsible for the acts, not Ryder. AUSA McManus agreed with Ryder and the PSR was revised to reflect this change. This does not require a ruling by the court.

Ryder objects to ¶ 19 and all other paragraphs of the PSR which indicate that he is one of the owners of AWS. AWS is owned by co-defendants Keith Smith and Wayne Adams. Ryder was the sole owner of R&R Contracting Services. The PSR was revised to reflect this change. This does not require a ruling by the court.

Burden of Proof

Ryder cites *Apprendi v. New Jersey*, 120 S.Ct. 2348 (2000) and *Blakely v. Washington*, 124 S.Ct. 2531 (2004) for the premise that any fact utilized to expand punishment beyond the statutory maximum must be proved beyond a reasonable doubt. The statutory maximum in this case is 120 months, but the guideline range is 37 to 46 months, so *Apprendi* does not apply.

The court applies a lesser burden of proof at sentencing than does the jury in deciding guilt or innocence. *United States v. Rodriguez* 2008 WL 5206876, 13 (5th Cir. ,2008) *United States v. Duhon*, 541 F.3d 391, 395-96 (5th Cir.2008). The Government bears the burden of proving by a preponderance of the relevant and reliable evidence that the facts support a sentencing enhancement. *United States v. Rodriguez*, 523 F.3d 519, 524 (5th Cir.2008). The Government has sufficiently met their burden in this case. The defendant's objection is OVERRULED and the 9-level sentencing enhancement shall remain unchanged.

Lake Charles, Louisiana, this 19 day of March, 2009.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE